# UNITED STATES DISTRICT COURT
## for the
### Western District of New York
### Civil Division

| | |
|---|---|
| Seaf A. Almashiakhy, <br><br> Plaintiff, <br><br> vs. <br><br> Christopher Wray – FBI Director; <br> FBI Supervisor #1, FBI Agents #1, #2, #3, #4, and #5; <br> David Pekoske -- TSA Administrator; <br> TSA Officers #1 & #2;  Airport Police Officers #1, #2, #3, and #4; United Airlines Employee Jane Doe; and United Airlines, <br><br> Defendants. | Case No. 1:23-cv-00841-JLS-JJM <br><br> **FIRST AMENDED COMPLAINT** |

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

**Plaintiffs Alleges:**

### JURISDICTION

1. This Court has jurisdiction over these claims pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(3) & (4), 5 U.S.C. §552, and 28 U.S.C. §2201-2202.  Venue is based on the Plaintiff's residence in Erie County and on the occurrence of most of the acts described herein taking place within the western district of the State of New York.

### INTRODUCTION

2. The Plaintiff, Seaf A. Almashiakhy, is an Iraq War Refugee and a naturalized US citizen, entitled to all the rights and privileges guaranteed by the US Constitution. This Complaint alleges that the Federal Bureau of Investigation (FBI) recruited Mr. Almashiakhy to work for them as a counter-terrorism informant and that he worked for the FBI in this capacity for two years; it alleges that after Mr. Almashiakhy refused to continue spying, the FBI fabricated false evidence against him in a scheme to coerce him to involuntarily spy for them after he refused to do so.  This Complaint further alleges the FBI shared that false evidence with Mr. Almashiakhy's family and friends and how they engaged in a criminal conspiracy with other Federal and New York State officials and with United Airlines to prevent Mr. Almashiakhy from traveling, in a further effort to coerce him

1

into involuntarily resuming his counter-terrorist work for the FBI; it describes how the FBI and the Transportation Security Administration (TSA) failed to follow their written rules when Mr. Almashiakhy tried to clear his name in violation of his rights under the US Constitution to defend himself by confronting the witnesses and challenge the evidence being used against him; and it alleges that the defendants use this law to willfully violate the rights of US citizens who are Muslim. The Plaintiff seeks monetary compensation for his injuries and a mandamus compelling the FBI and/or the TSA to disclose the evidence against him and to investigate the actions of the unnamed officers involved.

## THE PARTIES

3. Seaf Almashiakhy is a US Citizen who presently resides in, and at all relevant times has resided in, Erie County in the State of New York. He fled from Iraq to Jordan and Syria in 2004; he then came to the United States in July, 2009 and was granted war refugee status and became a US Citizen on April 30, 2015. Mr. Almashiakhy was first recruited in 2011 by the FBI at "Journey's End" (a local refugee organization) to gather information about terrorist activity in Iraq and in the US. Beginning in 2014, he worked with FBI agents as a counter-terrorist informant for two years and he then refused to continue that work in 2016. Since that time his travel has been restricted based on false allegations fabricated by the FBI. Mr. Almashiakhy is a businessman who, at all times described herein, has been engaged in the wholesale buying and retail selling of Halal meats and Groceries.

4. Defendant Christopher Wray is the present Director of the FBI.

5. Defendants FBI Agents #1 & #2 "Michael" and "Joseph", respectively, recruited Mr. Almashiakhy to act as a counterterrorist and he believes they facilitated his green card application and his citizenship application.

6. Defendants FBI Agents #3 & #4, "Brandlon" and "Mark", replaced Agents 1 & 2 as Mr. Almashiakhy's FBI handlers and intentionally engaged in conduct designed to violate his rights.

7. Defendants TSA Administrator David Pekoske is responsible for TSA policy and for the actions of TSA agents #1 & #2 (TSA #1 & #2) who were present at the Buffalo airport on June 4, 2023, where they conspired with United Airlines and the FBI in violation of New York State Law and in violation of Mr. Almashiakhy's rights under the US Constitution.

8. Defendants Buffalo Airport Police Officer #1 & #2 (APO #1 & #2) were present on January 24, 2021; both participated in the scheme to violate Mr. Almashiakhy's rights; Defendants APO #3 & #4 were present at the Buffalo airport on June 4, 2023.

9. Defendant Jane Doe is an unidentified United Airlines employee receptionist at the Buffalo Airport who, on June 4, 2023, contacted the FBI and/or the TSA and participated with Federal and New York State officials to refuse to allow Mr. Almashiakhy to fly on a United Airlines plane.

10. Defendant United Airlines (UA) is a common carrier, engaged in the business of providing air transportation to the general public, the activities of which affect interstate or foreign commerce; on three occasions more fully described below, UA fraudulently sold tickets for air travel to Mr. Almashiakhy when they knew, or should have known, that he would not be allowed to fly on their planes.

FACTUAL ALLEGATIONS

11. FBI Agents #1 & #2 first recruited Mr. Almashiakhy at a local refugee organization. At the beginning of his relationship with these agents, they asked him to keep an eye out for terrorist activity in the US Iraqi community and they met with him every 2-3 months. During the first two years of this involvement, Mr. Almashiakhy was occasionally stopped and questioned at the US Border when returning to the US from Canada; when he asked Agents #1 & #2 if they could do anything about this the questioning at the border stopped; this led him to believe the FBI had some control over his international travel.

12. Mr. Almashiakhy first applied for a green card in 2010. While his Green Card application was pending, in October 2013, Mr. Almashiakhy's father died in Iraq and Mr. Almashiakhy was unable to be present there because of travel document complications due to his green card application being delayed. He asked Agent #1 for help and Agent #1 gave him a paper clearing his Green Card application -- he received his green card in the mail within one month. Mr. Almashiakhy's application for US Citizenship was granted in 2015 and he believes the unnamed FBI agent defendants facilitated approval of his applications.

13. Mr. Almashiakhy worked with Agents #1 & #2 for several years and they told him the counter-terrorist information he provided them was very valuable. He met with them once or twice a week from February, 2014 through November, 2016. In January 2016, Mr. Almashiakhy learned that an Iraqi friend of his, who was then living in Jordan, had some valuable information on terrorist activity in Iraq. He told Agent #1 of this information and Agent #1 told him that he could not officially tell Mr. Almashiakhy to go to Jordan to get this info, but that if he could get

3

the information that would be a good thing. Mr. Almashiakhy did go to Jordan to visit his friend there and when he arrived in Jordan, he was sent to the Jordanian Intelligence Office where he was detained and questioned for about three hours. Among other things, the Jordanian intelligence asked him a long series of 20-30 questions. Mr. Almashiakhy did then visit his contact in Jordan and when he returned to the US, he gave the counter-terrorist information to Agents #1 & #2, and was informed that the information useful and important to the FBI.

14. When Mr. Almashiakhy met with Agent #1 after returning from Jordan in 2016, Agent #1 asked him the same exact set of 20-30 questions that the Jordanians had asked him. Mr. Almashiakhy confronted Agent #1 and asked him why the agent had had him detained in Jordan and why he was being treated so badly, after he had voluntarily gone out of his way to gather and report valuable, counter-terrorist information. Agent #1 appeared embarrassed and shocked, and it appeared to Mr. Almashiakhy that he had caught the agent in an act of betrayal.

15. Agents #1 & #2 offered him an envelope full of money, telling him that his information was important and useful in their fight against terrorism, but he refused and told them he loves the United States and is happy to be of service and that he wanted to help them because he believed they helped him become a US Citizen. Mr. Almashiakhy told Agents #1 & #2 that he did want to become an FBI Agent in an official capacity though, and they told him to apply for a job as an interpreter, and he did then apply.

16. On November 9, 2016, shortly after he applied for an FBI translator job, Agent #1 told Mr. Almashiakhy he needed to come into the FBI office and give his fingerprints on paper for the job; on November 23, 2016, he did give his fingerprints (ink on paper) to Agent #1. (His fingerprints were already on file in digital form).

17. Around this time Mr. Almashiakhy was in the process of getting divorced. That same week of November 23, 2016, unknown FBI agents went to his then wife seeking information about him. As a Muslim, this FBI contact with his wife was very offensive to Mr. Almashiakhy, and he consulted with his then attorney, Michael Berger, who advised him to sever his relationship with the FBI. Based on this advice Mr. Almashiakhy told the FBI on November 29, 2016, that he did not want to work with them anymore.

18. Shortly after he terminated his relationship with the FBI, Mr. Almashiakhy was detained at gunpoint and questioned at the Rainbow Bridge for five hours when he was re-entering the US from Canada. Because of this detention, he contacted the FBI and asked to meet with Agent #1 to get an explanation for why he was again being detained and questioned at the border. He met with Agent #1 on January 20, 2017, at the FBI office and Agent #1 told Mr. Almashiakhy to

4

talk with "the supervisor". The defendant FBI Supervisor #1 sat down with Mr. Almashiakhy and told him that the information he had been providing was very important and so they wanted him to continue working with the FBI as a counterterrorist and they were changing his team. Supervisor #1 introduced this new team of agents, named "Brandlon" and "Mark" (Agents #3 & #4, respectively). This new team was more abrasive in the way they dealt with Mr. Almashiakhy, and they interrogated him from 10:30am until 4:00pm that day and accused him of terrorist activity, claiming they had his fingerprints on an electronic terrorist device. This interrogation was recorded.

19. While Agents #3 & #4 were interrogating Mr. Almashiakhy at the FBI office that day, other unknown FBI agents went to talk with a friend of his and three (3) of his family members. FBI agents also talked to attorney Michael Berger on the phone, with Mr. Almashiakhy present, and they talked to another witness a few days later. The unknown FBI agents told these 5 friends and family members that they had Mr. Almashiakhy's fingerprints on a computer circuit board used for terrorist activity in Iraq – information that these agents knew to be fabricated, false information.

20. While they had Mr. Almashiakhy at the FBI office that same day, January 20, 2017, agents #3 & #4 showed him a photo of a fingerprint on a circuit board, claiming it was his fingerprint, and they told him that if he cooperated with them, they would try help him with his travel restrictions. It appeared to Mr. Almashiakhy that this fingerprint evidence was patently fabricated, because the fingerprint was clearly the same ink that the FBI used when they took his second fingerprints on paper, and he has never engaged in terrorist activity; ever since this time the FBI have refused to charge Mr. Almashiakhy with a crime even though he has told them repeatedly to charge him if they thought this evidence was true; the FBI has refused to charge Mr. Almashiakhy with a crime, because they know the disclosure rules of criminal defense would apply, and the TSA has refused to disclose the evidence against him in violation of their own rules, thus denying him an opportunity to challenge the legitimacy of the purported evidence.

21. At the end of this interrogation, on January 20, 2017, Agent #3, with Agent #4 present, told Mr. Almashiakhy that they knew he was telling the truth because all the people who they talked to that day gave them the same information, which matched with everything he told them. So, they said, if he would agree to take a lie detector test, they would then forget about the fingerprints, and he could then resume his undercover work for the FBI as before and his travel restrictions would be removed.

22. Though he continued his refusal to spy, Mr. Almashiakhy initially agreed to take the test and the FBI agents hooked him up to the a lie detector machine. The agents then read him his rights, before beginning the test, including the right to have his attorney present. When he heard that, he called his attorney, Mr. Berger, on the phone, and asked him what he should do. Mr. Berger advised him not to take the test. The FBI agents then spoke with Mr. Berger on the phone and informed him again that they had fingerprint evidence indicating that Mr. Almashiakhy was involved in terrorist activity in Iraq, in order to persuade him to advise Mr. Almashiakhy to take the lie detector test. Mr. Berger advised Mr. Almashiakhy to refuse to take the test and Mr. Almashiakhy followed that advice.

23. In May 2017 United Airlines (UA) sold a plane ticket to Mr. Almashiakhy and on May 23, 2017, when he went to the airport to fly to Iraq, Mr. Almashiakhy was detained by Homeland Security (TSA) and US Customs and Border Protection at the Buffalo airport. He called Agent #3 on the phone and Agent #3 came to the airport and told Mr. Almashiakhy that he could only travel if he takes the lie detector test. UA did not refund the purchase price of the ticket.

24. In July of 2017 Mr. Almashiakhy met with agent #3 because a contact in Iraq had given him some counter-terrorist information that he needed to share with the FBI, (even though he was not willing to continue as an informant, the information was too important to hold onto without sharing it with the FBI); at this meeting agent #3 told Mr. Almashiakhy that the device with his alleged fingerprint was not only used for terrorist activity, but that it was also used for harmless, regular consumer purposes, because they wanted Mr. Almashiakhy to know that the FBI wanted Mr. Almashiakhy to know they knew it was invalid.

25. In May of 2018, two FBI agents appeared at Mr. Almashiakhy's home and asked him to give a saliva DNA sample. He called his attorney, Michael Berger, for advice and Mr. Berger advised MA to refuse to give a sample. When he did refuse, the agents served him with a subpoena to appear in federal court and submit a buccal swab DNA sample. He did appear in court and the same two agents who appeared at his house were there in court. At court Mr. Almashiakhy overheard the agents speaking to a court clerk attempting to have the clerk submit the sample with no court record, but the clerk refused to do so. He took this as further evidence that the FBI has no real evidence against him and that they lied to get his DNA.

26. On July 23, 2019, Mr. Almashiakhy again attempted to travel to Canada. He was stopped at the Canadian Border and the Canadian Customs and Immigration for investigation. A Canadian officer called US Homeland Security (USHS), with Mr. Almashiakhy present, and USHS refused to say anything good or bad about Mr. Almashiakhy, but they told Canadian Customs that he might be a risk, so the officer did not want to chance letting him into Canada.

27. On his return to the US that day, July 23, 2019, at the Rainbow Bridge, the US Customs and Border Protection scanned his passport, and the officer immediately pointed his gun at Mr. Almashiakhy and handcuffed him. Border Protection officers then interrogated him for five hours (the handcuffs were removed after about one-half hour). During the course of this interrogation, Mr. Almashiakhy told the officers of his confidential informant work with the FBI and when he gave the FBI agent #1's phone number. Border Protection then called Agent #1 and got clearance from Washington D.C. for Mr. Almashiakhy to be released and allowed to enter the US.

28. On January 22, 2020, Mr. Almashiakhy submitted a Traveler Redress Application via the Department of Homeland Security (DHS) Traveler Redress Inquiry Program (TRIP). On February 12, 2020, this case was closed without any written explanation. (See attached Exhibit A).

29. On January 24, 2021, defendant UA again sold Mr. Almashiakhy a plane ticket to Baghdad via Washington DC, when they knew or should have known that he was on a "no fly list". When Mr. Almashiakhy arrived at the Buffalo airport the UA lady at the check-in counter called the UA office and two Airport Police Officers (#1 & #2) confronted Mr. Almashiakhy, one with a dog, along with an FBI Agent identified as Agent "Daily" (Agent #5). Mr. Almashiakhy showed Agent #5 the DHS TRIP letter dated 2/12/2020, which states that his Traveler Redress Application had been closed. Agent #5 looked at the letter, called the FBI, and told Mr. Almashiakhy that he could not travel. Mr. Almashiakhy's attorney, Michael Berger, called Agent #5 and spoke on the phone with him, but Agent #5 refused to give any further explanation or help to resolve the matter. Agent #5 did tell Mr. Almashiakhy that he must talk with the FBI before he travels outside the US. UA again did not refund the purchase price of the plane ticket. UA is well aware that Muslims and persons of Middle Eastern descent are disproportionately included on the no fly list and that people like Mr. Almashiakhy are routinely prohibited from flying, even though defendants are well aware that most terrorism in the United States is caused by Caucasian individuals.

30. On June 4, 2023, defendant UA again sold Mr. Almashiakhy another plane ticket to travel to Newark New Jersey for business, when they knew or should have known that he was not allowed to fly. He arrived at the airport and went to check-in at the UA counter and 5:30 pm.. There were two ladies working, one white and one black. The black lady, Defendant Jane Doe, took his ID and said she had to call the UA main office and left the counter. She came back in 15-20 minutes and told Mr. Almashiakhy that he was on a "no fly list".

31. This was the first time, in six (6) years that he has been prevented from traveling, that Mr. Almashiakhy has been informed that he was on a "no fly list". He asked the UA lady why he was on the list, and she said she didn't know why, but that TSA had him on the list. Then two (2) defendant Transportation Security Administration (TSA #1 & #2) officers appeared, -- one of whom identified himself as "Paul Greenan" (TSA #1) -- along with two defendant Airport Police, #3 & #4 -- one of whom had a name tag "R. Syracuse" (APO #3) and the other (APO #4) was a female with a police dog -- who confronted Mr. Almashiakhy. TSA #1 told Mr. Almashiakhy that he was on the no-fly list and that his placement on the list was nothing local, that it was high up in Homeland Security/TSA and there was nothing they could do about it locally. Again, UA did not refund the plane ticket purchase price.

32. On June 5, 2023, Mr. Almashiakhy submitted a second DHS TRIP Traveler Redress Application.

33. On July 19, 2023, the Department of Homeland security responded to Mr. Almashiakhy's second Redress Application by informing him he is on the no-fly list because he "may be a threat to civil aviation or national security".

35. The defendants have failed to conduct an inquiry of any kind to determine whether the allegations about Mr. Almashiakhy's purported suspected terrorist activity satisfies the "probable cause" standard under the TSA Defendant's published policy, and they have negligently and/or intentionally and maliciously continued to rely upon that false information, with the specific purpose of subjecting Mr. Almashiakhy to humiliating civil rights violations.

CONSPIRACY to VIOLATE RIGHTS -- RICO

34. The above paragraphs 1-33 are restated and realleged here in their full force and entirety.

35. 18 USCS §241 specifically prohibits Conspiracy against rights; all of the above-named defendants have conspired and acted in concert to injure, oppress, threaten and intimidate Mr. Almashiakhy because he exercised his right to refused to continue to act as a spy, to Mr. Almashiakhy of his right to confront witnesses and challenge the legitimacy of evidence being used against him, and they have deprived him his right to travel freely, based solely on his Arabic heritage, on his Muslim religion, and/or his national Iraqi origin, all in violation of 42 U.S.C §1985(3) with intentional malice and reckless disregard and callous indifference for his safety and his rights as a person and his Constitutional rights as a US citizen.

36. The predicate acts, other than conspiracy, as outlined above, and as more fully set out in the RICO Case Statement, include violations of NY PL 240.50, falsely reporting an incident; NY PL §135.35 Labor trafficking; and NY PL §135.65 Coercion; as to defendant UA – violation of NY PL §190.60 Scheme to defraud in the second degree; these crimes were committed by the FBI and the TSA defendants with the knowledge of, and at the direction of Defendants Wray and Pekoske.

37. FBI Agents #1-5 found Mr. Almashiakhy useful as a counter-terrorist informant specifically because of his Arabic heritage and a native Arabic speaker, because of his Muslim religion and because of his Iraqi Origin; for this reason and this reason alone, FBI Agents #1-5 conspired with each other, at the direction and control of Christopher Wray and FBI Supervisor #1, and they later conspired with TSA defendants, including David Pekoske, and defendant local and state officials and with UA, all of whom acted together to implement the unlawful discriminatory scheme, to coerce Mr. Almashiakhy into involuntary servitude as a counter terrorist spy/informant against his will.

38. This concerted fraudulent violation of Mr. Almashiakhy's rights by Federal and State officials also violates New York State's Civil Rights Act Article 4 §40-c(2) which states that no person shall be discriminated against in his civil rights because of his race, creed, or national origin and Defendants, together, also violated NYS Article 4 §, which states that any person who excludes a citizen of this state from the equal enjoyment of any common carrier is guilty of a misdemeanor crime, in addition to the alleged violations of New York State criminal statutes.

39. As a direct result of the defendants' criminal actions Mr. Almashiakhy has suffered general and specific losses and is entitled to punitive damages to be determined at trial. Mr. Almashiakhy has not been allowed to travel by air since 2016; during the seven years he has not been allowed to travel, he has suffered economic losses of business opportunities, has been deprived of his familial connection with his aged, ailing mother who lives in Iraq and has been separated for an extended period from other family and friends in Iraq; the incidents described above and the deprivation of his rights, including the false arrests, imprisonments, interrogations and the confiscation of electronic devices, have has caused him to suffer public humiliation, loss of self-worth, diminution of his value as a human being, mental anguish and damage to his general reputation, all leading to general and special damages and punitive damages in an amount to be determined at trial.

SECOND CAUSE OF ACTION – Deprivation of Rights Under Color of Law

40. The above paragraphs 1-39 are restated and realleged here in their full force and entirety.

9

41. Bivens claims by the plaintiff against Director of the FBI, Christopher Wray, FBI Agents #1 - #5, TSA agents #1 & #2, and Airport Police #1-#4, both in their official capacities and as individuals, for violated Mr. Almashiakhy's procedural Due Process rights under the Fourth and the Fourteenth Amendment to the US Constitution by fabricating evidence and knowingly using false evidence against him in order to deprive of the right to travel freely while denying him a fair opportunity to confront the evidence and the witnesses against him; pursuant to 42 USC §1983 are liable to the defendant because they deprived Mr. Almashiakhy of his rights in concert with state and local government officials, under color of law, intentionally and/or with reckless disregard for the accuracy of the allegations against him.

42. Specifically, with reckless disregard for the safety and rights of US citizens, sometime between November of 2016 and January of 2017 when he was interrogated by the FBI, Defendant Wray instructed the defendant FBI Agents to fabricate evidence and use it to intimidate and coerce Mr. Almashiakhy into providing useful information. Wray later collaborated with TSA Director Pekoske to put Mr. Almashiakhy on the "no fly list" in a further effort to force him to act as a spy for the FBI; Pekoske knew the information against Mr. Almashiakhy was fabricated and that the purpose was to coerce Mr. Almashiakhy into spying, so he directed the TSA to fail to follow its own written rules, which require the TSA to evaluate the evidence and disclose the findings to Mr. Almashiakhy.

43. As a direct result of the defendants' actions, during the past 6 years that he has not been allowed to travel by plane the plaintiff Seaf Almashiakhy has suffered economic losses of business opportunities, been deprived of his familial connection with his ailing mother who lives in Iraq and been separated for an extended period from family and friends in Iraq, and he has suffered public humiliation, loss of self-worth, diminution of his value as a human being, mental anguish and damage to his general reputation, all leading to general and special damages in an amount to be determined at trial.

44. The defendants' intentional and reckless misconduct as set forth above entitle Mr. Almashiakhy to punitive damages from said defendants in an amount to be determined at trial.

### THIRD CAUSE OF ACTION – FAILURE TO SUPERVISE

45. The above paragraphs 1-44 are restated and realleged here in their full force and entirety.

46. To the extent that the defendant FBI AND TSA agents committed criminal acts, they acted outside of the scope of their employment, since the FBI and TSA mission statements

specifically prohibit such acts and those criminal acts were committed in the State of New York. The defendant Directors Wray and Pekoske, on the other hand were acting within the scope of their employment in training and directing the defendant agents from the Directors' offices in Washington DC.  To the extent the defendant directors were acting within the scope of their employment, at least on the face of their activities, the fact that they were engaged in a conspiracy the violate rights should not be an escape mechanism top avoid justice.

47. Defendants FBI Director Christopher Wray and TSA Director Pekoske, in their official capacities, and by their intentional and/or reckless disregard and wanton indifference to the misconduct of defendant FBI Agents and TSA agents and by the defendant Directors' failure to train, failure to supervise and/or failure to discipline those Agents' conduct as described above, has subjected Mr. Almashiakhy general and specific damages to be determined at trial. As a direct result of the Defendant Director's actions and failures to act, during the time he has not been allowed to travel, the plaintiff has suffered economic losses of business opportunities, been deprived of his familial connection with his ailing mother who lives in Iraq and been separated for an extended period from family and friends in Iraq, and caused him to suffer public humiliation, loss of self-worth, diminution of his value as a human being, mental anguish and damage to his general reputation, all leading to general and special damages in an amount to be determined at trial.

48. Defendants Wray and Pekoske's failure to investigate the misconduct alleged in this complaint, despite having been notified of the alleged misconduct, and subsequent failure to correct the false information or allow Plaintiff Almashiakhy an opportunity to fairly contest the merits of the alleged FBI information against him, the defendant Directors' conduct constitutes aiding and abetting the ongoing crimianllity, after-the-fact.

FOURTH CAUSE OF ACTION – VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT

49. The above paragraphs 1-48 are restated and realleged here in their full force and entirety.

50. Mr. Almashiakhy is a devout Muslim; One of the Five Pillars of his religion is Pilgrimage or Hajj; according to his faith he and every Muslim whose health and finances permit it, must travel to Mecca at least once during his lifetime.  The defendant FBI agents know this, and they know that Mr. Almashiakhy has not yet completed this pilgrimage.

51. The defendant FBI agents are intentionally blocking Mr. Almashiakhy from practicing his religion, based on knowingly false allegations, in order to further coerce him into involuntary servitude; in effect, they are preventing him from practicing his religious faith unless he agrees to act as a spy for them.  The US Constitution specifically prohibits involuntary servitude and the Religious Freedom Restoration Act 0f 1993 specifically prohibits the government from "burdening a person's exercise of religion".

52. As a result, Mr. Almashiakhy can't practice his religion and he respectfully asks the court to compel the FBI and/or the TSA and any and all other agencies to whom this false accusation has been transmitted, to remove any and all impediments to his ability to travel freely in the future.

FIFTH CAUSE OF ACTION – VIOLATION OF THE PRIVACY ACT

53. The above paragraphs 1-52 are restated and realleged here in their full force and entirety.

54. From January 20, 2017, when unknown FBI Agents disclosed to Mr. Almashiakhy's friends and family members the false information that they had found his fingerprints on an terrorist device, through June 4, 2023, the FBI and the TSA have continued to publish false evidence that they know to be false in order to prevent him from traveling, pursuant to 49 USC §114(h)(2)-(3), and they have failed to correct the false information under the TSA redress procedure.

55. The FBI is an agency within the Department of Justice (DOJ) and reports its activity to the DOJ; 28 CFR §50.2(b)(6)(iii) specifically prohibits the release of information regarding fingerprints because "it generally tends to create dangers of prejudice without serving a significant law enforcement function.".  This policy preserves the integrity of investigations and the privacy of individuals involved prior to any public charges of criminal violations and it preserves the rights of people not yet charged with a crime.

56. The FBI has continued to publish false fingerprint evidence about Mr. Almashiakhy to private individuals, to the TSA and to United Airlines personnel; in addition to limiting his right to travel this dissemination also places Mr. Almashiakhy in personal danger and diminishes his standing in the community and damages his reputation; the actions of the FBI and the TSA defendants violate the U.S. Privacy Act and the FBI regulations and policies under 28 C.F.R. §50.2(b).

57. The ongoing actions of FBI/TSA are willful and intentional; the other defendants act with malicious and reckless disregard and callous indifference to truth or falsity of information they receive and then use to violate Mr. Almashiakhy's right to travel; the disclosure of this

information cause Mr. Almashiakhy to suffer extreme mental anguish, humiliation, embarrassment, damage to his general reputation and loss of his earning capacity; he has suffered actual damages and is entitled to a compensatory award from the defendants in an amount to be determined at trial as well as necessary costs and attorney fees as determined by the Court.

### SEVENTH CAUSE OF ACTION: DECLARATORY AND INJUNCTIVE RELIEF

58. The above paragraphs 1-57 are restated and realleged here in their full force and entirety.

59. Upon information and belief, the FBI has no intention of ever pressing criminal charges against Mr. Almashiakhy because they know they do not have any credible evidence that he ever participated in any terrorist activity; none-the-less, TSA intends to continue conspiring with the TSA to violate the Constitutional rights of Mr. Almashiakhy, by refusing to follow their own redress rules to investigate and disclose the probable cause.

63. Plaintiff seeks a mandamus compelling the defendants to disclose the evidence they have against Mr. Almashiakhy, pursuant to their own rules, or to remove him from the no-fly list.

Dated: December 4, 2023
Law office of Peter B. Nicely
By: /s/ Peter B. Nicely
Peter B. Nicely
3 Cottage St.
Buffalo, NY 14201
(716) 602-6346
peternicely@gmail.com
Attorney for Seaf Almashiakhy, ~~Ahmed Almashiakhy and Yousef Almashiakhy~~

13